**Adam D. Ford** (UTB# 11363)
FORD & CRANE PLLC
333 E. Main Street, #451
Lehi, Utah 84043
Telephone: (213) 915-4291
Email: adam.ford@fordcranelaw.com
*Attorney for Plaintiff Petersen Games, LLC*

**IN THE UNITED STATES DISTRICT COURT,
IN AND FOR THE CENTRAL DISTRICT OF UTAH**

| | |
|---|---|
| PETERSEN GAMES, LLC, | **VERIFIED COMPLAINT** |
| Plaintiff, | |
| vs. | Case No. 2:23-CV-422 |
| CCS-EXPRESS INTERNATIONALE LUFTFRACHTSPEDITION, GMBH, John Does I – X, XYZ Corporations and/or Limited Liability Companies I – X. | |
| Defendants. | |

Plaintiff Petersen Games, LLC, by and through their attorney Adam D. Ford of Ford & Crane PLLC, and as verified by Sandy Peterson, hereby files complaint against CCS-Luftfrachtspedition, GmbH, and alleges as follows:

**INTRODUCTION**

1. A large German shipping conglomerate has for years been holding a small American family company hostage, double and triple billing for services, sometimes for services

1

not provided, breaching contracts, and holding inventory hostage until ransom payments were received.

2. The total amount CCS owes Petersen Games related by its overbilling alone equals $495,789.

3. The value of the inventory owned by Petersen Games currently being held hostage by CCS equals $340,205.58.

4. The Petersen family patience has reached its breaking point and they now come before this Court requesting help to escape the threats, bullying, extortion and inventory hostage taking that it has been beholden to for the past many years.

5. Over the last decade, CCS has become the main shipping partner of Petersen Games by insisting on a greater and greater share of Petersen Games shipping business in order to perform on previously agreed to work. When questioned about erroneous billing practices and numerous shipping mistakes, CCS representatives became angry and deepened their threats.

6. Most recently, CCS has threatened to file lawsuits against Petersen Games in Germany, threatened to coerce EU customs agents to refuse Petersen Games products into the common market, threatened to use their influence to have Petersen Games' VAT tax registration canceled ("which will make business for you impossible"), threatened to open attacks on the reputation of Petersen Games on multiple online channels, and have threatened to sell off "all the

remaining [Petersen Games] products we still have in our warehouses" and keep the proceeds for themselves.[1]

7.  Petersen Games now looks to the Courts of the United States for protection and redress.

## PARTIES, JURISDICTION AND VENUE

8.  Plaintiff Petersen Games, LLC ("Petersen") is a limited liability company with offices and operations in the State of Utah where the relevant negotiations and activities and shipping coordinations set forth herein took place.

9.  Defendant CCS-Luftfrachtspedition, GmbH ("CCS") is a foreign corporate entity with its principal place of business in the nation of Germany.

10. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1330, 1605 and 2201.

11. Venue is proper in this Court pursuant to 28 U.S. Code § 1391(c)(3) because the defendant is a foreign entity which is not a resident of any U.S. state and Plaintiff elects to bring suit in the Central Division of the Utah Federal District Court. Petersen Games maintains an its board of directors, an office and key employees in the State of Utah.

## FACTUAL ALLEGATIONS

12. Plaintiff incorporates the foregoing paragraphs herein.

---

[1] Email from Maxi Ebert of CCS to Arthur Petersen dated June 9, 2023 at 1:31 AM.

13. Petersen Games is a family business in engaged in inventing, manufacturing, and selling board games worldwide. Among its most popular games are Cthulhu Wars (and its spin-offs), Planet Apocalypse, Gloranthia: The Gods War, and Hyperspace.

14. A major market for their sales is Europe, and particularly the country of Germany where board games in general, and the games sold by Petersen Games particularly, are popular.

15. Petersen Games has third-party partners manufacture its games in Asia and the games are shipped directly from the manufacturer to distribution centers around the world, including the United States, Germany, Canada, and Australia.

16. After using many shipping partners for many years, in January of 2018 CCS proposed an agreement pursuant to which they would provide more favorable payment terms (with interest accruing on the balance) if Peterson would give them global exclusivity for shipping and logistics.

17. Fearing disruption of their operations and CCS seizing inventory in their control, Petersen reluctantly agreed to terms and entered into exclusivity and loan agreements with CCS and began to direct all their shipping needs through CCS

18. Having Petersen Games locked into an exclusive contract, CCS routinely processed orders from Petersen Games far slower than any other fulfillment provider Petersen Games had previously worked with.

19. CCS regularly lied to Petersen Games regarding the status of shipments and how inventory was packed for shipping.

20. CCS regularly double shipped orders to customers, doubling expected shipping costs and causing inventory shortages for other prospective buyers. When informed of the errors, CCS refused to rectify the mistake either by paying for return shipping or crediting the Petersen Games account.

21. For instance, CCS's shipping partner in the United States, Liftwing LLC, erroneously shipped 160 pallets of games to Seattle in December 2022 and January 2023. The product was not properly wrapped to prevent water damage and many of the pallets were disorganized, causing damage to the product.

22. After arrival in Seattle, Petersen Games inspected the pallets and found that when properly stacked, Petersen Games was able to consolidate the inventory to only 92 pallets (a reduction in about 70 pallets). The mismanagement of this shipment caused an approximate doubling of the cost of the shipment, a loss to Petersen Games of approximately $25,000.

### Loan and Exclusivity Agreements

23. In September of 2022, Petersen Games and CCS made an agreement whereby Peterson would transfer $150,000 USD to an escrow account to be held until CCS released all Petersen Games inventory in their possession, outbound shipping prepaid, such that "all CCS warehouse locations will be emptied with all Petersen Games products, nothing remaining on our [CCS] warehouses for PG [Petersen Games]."[2]

---

[2] Email from Maxi Ebert of CCS to Sandy Petersen dated September 26, 2022 at 6:44 AM.

24. On November 1, 2022, CCS and Petersen Games entered into a Loan Agreement with the following terms:

> Petersen Games LLC will pay €150,000 to a law firm escrow account. Petersen Games will introduce the law firm and conditions on the Escrow Account immediately after signing this contract. Immediately upon receipt of confirmation of receipt of funds from law firm, CCS-Express GmbH will release the Inventory, in whatever location worldwide, with pick-up and transport to be arranged and prepaid for by Peterson Games LLC. Within 24 business hours after the Inventory is released by CCS-Express GmbH, Petersen Games LLC will instruct the law firm to disburse the €150,000 to CCS-Express GmbH.

25. Petersen Games did deposit $150,000 USD into an escrow account pursuant to the agreement, in two transfers, the final one being on November 10, 2022. A letter confirming the receipt of escrowed funds in the amount of $150,000 USD was sent to Kurt Ebert of CCS on that same day. The letter read in part: "We will hold these funds until notified to send them to your company after the release of Peterson Games LLC inventory which CCS-Express GmbH is currently holding."

26. Immediately after the signing of the November 1, 2022 Loan Agreement, CCS began to backtrack, wanting payment before releasing the hostage inventory. On November 11, Maxi Ebert of CSS texted Arthur Petersen, "Just pay us the money and we release it [the inventory]."

27. In the fall of 2022 Petersen Games entered into a contract to sell a significant portion of its inventory being held by CCS for $269,000, on condition that it be received by the buyer in time for Christmas sales events. CCS lied to Petersen Games, saying they could not determine which pallets were to be shipped to the buyer because the pallets were covered in opaque plastic. Petersen Games later learned the pallets were wrapped in clear plastic and could

6

have been easily differentiated. This lie and failure to ship product, even after entering into the loan and exclusivity agreements, resulted in Petersen Games losing the contract.

28.     Petersen Games attempted multiple times to arrange for the pick-up and shipping of their inventory out of CCS facilities, but was unable to do so because CCS refused to provide the volume and weights of the shipments. Without this information it is impossible to arrange for shipping of large-scale bulk goods such as the Petersen Games inventory. When pressed for the volume and weight information by Petersen Games, CCS responded by demanding payment before releasing the inventory.

29.     CCS did not release and transfer Petersen Games inventory in November and December of 2022, in time for the Christmas shopping season, causing significant losses to Petersen Games during what is typically by far the busiest and most lucrative time of year for board game manufacturers.

30.     In email communications in December of 2022 between Petersen Games and CCS, CCS demanded payment of the escrowed funds and conceded that it was still holding inventory. As late as January 17, 2023, Maxi Ebert confirmed that "the majority [but not all] of the goods have ben picked up."[3]

31.     CCS is to this day still holding Petersen Games inventory valued at $567,009.30 hostage in Canada and Europe, demanding the release of the escrowed money while they have still not performed their obligations under the Loan Agreement of November 1, 2022.

---

[3] Email from Maxi Ebert dated January 17, 2023 at 11:06 AM.

32. Petersen Games engaged Investable SLC, LLC ("Investable") as outside financial experts to assist them in analyzing the billings and financial dealings with CCS. Investable spent nearly 100 hours studying all invoices sent by CCS and payments made by Petersen Games using two independent methods and data sets.

33. First, Investable analyzed invoices through CCS's customer portal, Wawi, and discovered 9 types of billing errors, many of which were repeated frequently. One class of error occurred 260 times out of a total of 814 total invoices. The 9 types of billing errors included:

    a. 4 duplicate invoices with different total owing (with one paid and one still showing outstanding).

    b. 260 instances of duplicate invoices with the same total owing (with one paid and one still showing outstanding)

    c. 33 instances of duplicate invoices (with both invoices paid)

    d. 3 instances of duplicate finance charges

    e. 62 instances of duplicate invoice numbers, but with different balance amounts showing owing.

    f. 12 instances of invoices with the same invoice number, but different suffix, with different balance amounts showing owing.

    g. 6 instances of invoices with the same invoice number, but different suffix, with the same balance showing owing.

    h. 8 instances of invoices with the same invoice number, but different suffix, with one showing a credit and one showing a balance.

      i. 2 instances of invoices with the same invoice number, but different suffix, with both showing credits.

34. Second, Investable collated all invoices from CCS to Petersen Games into one table, which revealed many instances of invoices logged in incorrect years and many instances of unpaid invoices being reissued without zeroing out the previous invoice being reissued.

35. Investable reported to Petersen Games that, before accounting for duplicate payments, the most that Petersen Games could owe CCS for its services was €114,416.13, far less than the €481,950.29 that CCS claimed was owed.

36. When confronted with these billing irregularities on a phone call with Kurt Ebert and Maxi Ebert of CCS, CCS became upset and questioned where Investable obtained the invoice data they analyzed. When told that the invoices came from CCS's own internal Wawi system, the Ebert's hung up the phone on Petersen Games and Investable.

37. On June 9, 2023, Maxi Ebert of CCS sent another bullying email to Arthur Petersen threatening to file lawsuits against Petersen Games in Germany, threatening to coerce EU customs agents to refuse Petersen Games products into the common market, threatening to use their influence to have Petersen Games' VAT tax registration canceled ("which will business for you impossible"), threatening to open attacks on the reputation of Petersen Games on multiple online channels, and threatening to sell off "all the remaining [Petersen Games] products we still have in our warehouses" and keep the proceeds for themselves.[4]

---

[4] Email from Maxi Ebert of CCS to Arthur Petersen dated June 9, 2023 at 1:31 AM.

9

38.     Instead of honestly sitting down and figuring out the accounting, instead of releasing the Petersen Games inventory as agreed, CCS seems intent on maintaining its course of threatening harm to Petersen Games if they do not just keep paying regardless of what is really owed, regardless of previous agreements.

## FIRST CAUSE OF ACTION
## Fraud/ Fraudulent Inducement

39.     Plaintiff incorporates the foregoing paragraphs herein.

40.     In order to prevail on a cause of action for fraud/fraudulent inducement in the District of Utah, a plaintiff must establish the following elements: (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representer either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge on which to base such representation; (5) for the purpose or inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.[5]

41.     CCS represented its invoices as accurate and earned. The invoices charged were in material amounts, in the hundreds of thousands of dollars. The invoices were in fact false. CCS either knew or should have known that its invoices were false as they overstate the amount owed by hundreds of thousands of dollars and may bear the same invoice number, but are double and triple counted in the amounts demanded to be paid. CCS has taken every action to ensure payment was made, including coercing loan and exclusivity agreements to be signed and holding

---

[5] Demarco v. Lapay, 2012 U.S. Dist. LEXIS 117462, *11 (D. Utah 2012); 2012 WL 3597540.

10

inventory hostage. Without knowing of the false billings, relying on the honesty of CCS, Petersen Games entered these agreements and made many payments to CCS in good faith. Petersen Games has now learned that they are the victim of fraud and the various loan and exclusivity agreements were fraudulently induced.

42. Peterson games prays for damages to be made whole and the invalidation of the agreements they entered into based on the fraudulent invoices.

## SECOND CAUSE OF ACTION
## Unjust Enrichment/ Quantum Meruit

43. Plaintiff incorporates the foregoing paragraphs herein.

44. In order to prevail on a cause of action for quantum meruit in the District of Utah, a party must establish that the defendant: (1) received a benefit, (2) appreciated or had knowledge of this benefit, and (3) retained the benefit under circumstances that would make it unjust for the defendant to do so.[6]

45. Petersen Games paid many thousands of dollars to CCS in reliance of the honestly and accuracy of the invoices presented to them. CCS gladly received these payments and attempted to obligate Petersen Games to further contractual ties. It would be a manifest injustice for CCS to retain the benefits of payments and contracts based on the false invoices.

---

[6] Zevallos v. Stamatakis, 2017 U.S. Dist. LEXIS 201961, *20 (D. Utah 2017).

11

## THIRD CAUSE OF ACTION
### Civil RICO (The Racketeer Influenced and Corrupt Organizations Act)
### 18 U.S.C. § 1962

46. Plaintiff incorporates the foregoing paragraphs herein.

47. The size and scope and duration of the false billing of CCS exceeds that which might reasonably be characterized by simple accounting mistakes. The use of threats of interference with taxing authorities and customs officials and slanderous and defamatory attacks on the business integrity of Petersen Games goes far beyond what would be reasonable in a billing dispute between good faith actors.

48. Maxi and Kurt Ebert and their shipping partners, including but not limited to Liftwing LLC, are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c).

49. The repeated false billing, taking of funds pursuant thereto, and the coercion to enter into exclusivity and loan agreements based on the leverage gained by the false invoices by CSS, Maxi and Kurt Ebert, CSS, and their shipping partners constitutes a criminal enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the Enterprise).

50. The amounts CCS claims it is owed pursuant to the fraudulent invoices constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6).

51. The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

52. The Enterprise operated on a global level and in interstate commerce.

53. Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

54. The injuries to Petersen Games are directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected payments.

55. Plaintiffs have also suffered damages by incurring expert's and attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

56. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**FOURTH CAUSE OF ACTION**
**Conspiracy under 18 U.S.C. § 1962(d)**

57. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs, as well as those asserted in other counts below.

58. Defendants and their shipping partners, including but not limited to Liftwing LLC, have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

59. By and through each of the Enterprise member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent

email communications among the Defendant and the Enterprise members concerning the issuing, collection on, and leveraging the invoices, Defendant knew the nature of the Enterprise and Defendant knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendant knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

60. Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the

61. Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to issue and collect upon unlawful debts, including the invoices and the obligations of the agreements secured via the leverage gained by the invoices.

62. Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

63. The participation and agreement of Defendant and each Enterprise member was necessary to allow the commission of this scheme.

64. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

65. 282. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected payments, lost customers, loss of goodwill, and lost profits.

66. Plaintiffs have also suffered damages by incurring expert and attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

67. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

A. Ordering Defendants to repay all amounts previously paid to Defendants in connection with the fraudulent invoices, including prejudgment interest;

B. Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the fraudulent invoices and loan and exclusivity agreements coerced thereby;

C. Awarding Plaintiffs direct and consequential damages to be shown at trial;

D. Awarding Plaintiffs treble damages;

E. Awarding Plaintiffs punitive damages;

F. Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

G.  Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury in this action of all issues so triable.

## VERIFICATION

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 30th day of June, 2023

/s/ Sandy Petersen
Sandy Petersen
(Signed electronically with permission)

DATED this 30th day of June, 2023.

FORD & CRANE PLLC

/s/ Adam D. Ford
Adam D. Ford (UTB# 11363)
*Attorney for Plaintiff*